**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**UNITED STATES OF AMERICA,**
        *Plaintiff,*

                                        Case No.    **24-CR-40023-TC-03**

v.

**RACHAEL MATOIAN,**
        *Defendant.*

---

**SENTENCING MEMORANDUM**

---

There is a battle that goes on inside of people. On one side is bad or evil—anger, envy, jealousy, doubt, sorrow, regret, greed, arrogance, self-pity, guilt, resentment, inferiority, lies, false pride, superiority, and ego. On the other is good—joy, peace, love, hope, serenity, humility, kindness, benevolence, empathy, generosity, forgiveness, truth, compassion, and faith. The side of evil wants bad from you and bad things for you. The side of good wants good from you and good things for you. But which side wins? How do the scales balance out? As a person stops and takes stock of their life, of their decisions, of their actions, they may think they have an answer—either the good side or the bad side. But in truth, the answer is simpler than it appears. The side that wins is the one you nurture.

Rachael is a 35-year-old woman whose life has tragically been inundated by abusive relationships—starting with a life-altering choice in her late teens and continuing through her harrowing experience with her codefendant, Jeremy Cushing. During her current detention, Rachael has stopped to ponder how the scales of good and bad weigh out. She took inventory of her life and quickly decided

1

that bad was winning. But upon further reflection, Rachael realized that the mistakes of her past, the bad decisions she had made, the trauma she had experienced, did not define her, or set the path for the rest of her life; that decision had yet to be written. It was then that Rachael realized she could and would cultivate the good side.

Rachael asks this Court to consider her traumatic history, her acceptance of responsibility, her plan for the future, and all other relevant factors in deciding what punishment is appropriate for her. Rachael recommends that an appropriate sentence is time served (23) months.

Trying to figure a person out—trying to analyze what events or actions, traumas or joys, mistakes or failures led them to be in a certain place at a certain time, led them to make a certain decision—is, one can assume, very much like trying to fix an old clock.

> When an antique clock breaks, a clock that's been telling time for two hundred or three hundred years, fixing it can be a real puzzle. An old clock like that was handmade by someone. It might tick away the time with a pendulum, with a spring, with a pulley system. It might have bells that are supposed to strike the hour. Or a bird that's meant to pop out and cuckoo at you. There can be hundreds of tiny, individual pieces, each of which needs to interact with the others precisely. To make the job even trickier, you often can't tell what's been done to a clock over hundreds of years. Maybe there's damage that was never fixed or fixed badly. Sometimes entire portions of the original clockwork are missing, but you can't know for sure because there are rarely diagrams of what the clock is supposed to look like. A clock that old doesn't come with a manual. So instead, the few people left in the world that know how to do this kind of thing rely on what are often called "witness marks" to guide their way. A witness mark can be a small dent, a hole that once held a screw. These are actual impressions and outlines and discolorations, left inside the clock, of pieces that might've once been there. They're clues to what was in the clock

maker's mind when he first created the thing.[1]

People, like antique clocks, don't come with a manual. It is impossible to uncover every person or event that affected an individual—that caused them to break or be repaired.

That task, to understand a person, becomes even more difficult in the context of sentencing her. When you must not only consider Rachael as a person, consider her unlawful actions in relation to the rest of her life, but must also consider society's interests in punishing or rehabilitating her, the best you can hope for is that you read the clues correctly. That you can discern enough from the "witness marks" visible in Rachael's life to judge her justly.

For Rachael, in the short term, the past nearly two years—since her arrest on March 2, 2024—have been leading to this moment. But in reality, it is not just the past 23 months that have led Rachael to be before the Court. Rather, the sum events of her life, in one way or another, are what have placed her in this arena. Rachael recognizes that she is before the Court because of the poor decisions she made in her life. And she accepts responsibility for those decisions, actions, and consequences. But they do not exist in a vacuum. Those bad decisions are only some of the millions of tiny, individual pieces, that interacted with each other over the course of her life. They, alone, cannot show the life that Rachael has led and continues to lead. So here, we try to provide more pieces, so that Rachael can be

---

[1] S-Town, *Chapter 1* (March 28, 2017) [podcast] *Available at: https://stownpodcast.org/chapter/1*

more fully understood.

**A Life Defined by Early Stability and Subsequent Struggle**

Rachael's story begins in San Diego, California, where she was born on September 26, 1989, into a supportive and stable environment. As the oldest of four children, she was raised by a mother who worked as a homemaker and a father who was a well-respected schoolteacher in their local community. Her childhood was marked by a sense of security and belonging; she fondly recalls the ritual of eating dinner with her family every night, where they would share details about their respective days. Rachael was provided with every necessity and never "went without," describing this period of her life as enjoyable, fun, and comfortable.

Her parents actively supported her personal growth and development, encouraging her participation in a variety of extracurricular activities that fostered discipline and physical health. Throughout her youth, Rachael was heavily involved in gymnastics, judo, and boxing. However, this foundation of stability was challenged during her teenage years when she began to struggle with rebellion and a deep-seated craving for attention, particularly from her father. This internal turmoil led her to experiment with methamphetamine at the age of 14, the same year (her freshman year) she was expelled from high school and experienced her first incarceration.

Around the age of 17 or 18, Rachael made what she now describes as "one of the biggest mistakes" of her life. Driven by a desire to follow her heart, she decided to leave her home and family to live with a man she believed was the love of her life.

4

She dropped out of high school and moved to Florida, but the relationship quickly soured. This choice resulted in a domestic battery charge and her eventual return to San Diego, where she fell into a deep cycle of addiction. It was during a subsequent period of incarceration that she met her link to Jeremy Cushing, setting the stage for the most destructive chapter of her life.

**The Architecture of Control: Coercion and Survival**

The story of Rachael Matoian's involvement in this conspiracy is not one of calculated greed, but rather a harrowing account of survival within a cycle of abuse and psychological entrapment. While she initially sought to make Cushing "happy" or "proud," he proved to be a manipulative and narcissistic individual who utilized an architecture of control over Rachael that left her with no viable way out. He utilized systematic isolation as a primary tool, intentionally traveling further and further away from her home in California to ensure she was physically and emotionally distanced from everyone she loved. Once isolated, Cushing subjected Rachael to a constant barrage of verbal and emotional deactivation. He frequently confiscated her phone to sever her ties to the outside world, taunting her that he was the only reason she had the device at all. He followed her when she tried to walk away, belittling her with names and ensuring she felt entirely worthless.

This abuse was not merely emotional; it was reinforced by an atmosphere of pervasive fear and the threat of violence. Rachael's codefendant, Leroy Noll, corroborated this terrifying dynamic, describing how Cushing used his technical "wizardry" to hack into phones and security cameras. Noll recalled being paralyzed

5

by fear after Cushing revealed he knew the exact addresses and phone numbers of Noll's family and children. This was not an idle threat; Noll was aware of an incident in San Diego where Cushing had a house "shot up" with guns because a participant did not follow instructions. Living under this constant shadow of violence, Rachael felt "stuck," believing she could never safely return home.

The depth of this fear is perhaps best evidenced by Rachael's conduct at her initial appearance. When Rachael appeared before Magistrate Judge Rachel E. Schwartz on May 20, 2024, she chose to waive her right to a detention hearing. This was not a move of indifference, but a calculated act of self-preservation. Living under a constant shadow of violence, Rachael felt "stuck" and was terrified of the prospect of being released while Cushing remained at large. To Rachael, the walls of the jail represented the only place she was truly safe from the man who had systematically dismantled her life.

Furthermore, Cushing exploited Rachael's addiction to maintain his grip. He intentionally kept her under the influence of drugs, actively preventing her from getting clean even when she expressed a desire to do so. This forced dependency ensured that Rachael remained subservient to his whims. Her participation in the fraud was driven by a desperate, trauma-bonded need to make her abuser happy rather than a personal desire for criminal gain. While she may have appeared to be "high up" in the chain of participants, this was a deceptive front; she was a manipulated tool used by Cushing to funnel the lion's share of the fraud proceeds back to him.

6

**Accountability and the Recognition of Harm**

Rachael recognizes that she is before the Court because of the poor decisions she made in her life. She does not view her arrest on March 2, 2024, as a stroke of misfortune, but as a necessary intervention; she had already begun to "abort" her participation in the scheme because she "did not like participating anymore." She acknowledges that she did not just happen upon this conspiracy; she reached for it during a period of profound personal weakness, choosing to "dabble in drugs" rather than maintain her sobriety the lawful employment she once held.

Rachael is also deeply mindful that her actions reached far beyond a kiosk screen. She understands that over 200 individuals had their identities and sense of security compromised because of this conspiracy. While Pavilion Payments may have made these individuals financially whole, Rachael acknowledges the emotional distress her participation helped create. She accepts the sentence in this case not as an end, but as the first installment of a lifelong commitment to accountability and a total rejection of the bad side she once nurtured.

**Growth, Insight, and the Path Forward**

Looking back on her life, Rachael can now see that falling into her addiction and nurturing evil is what led her to this Court. Rachael has spent a lifetime making decisions that she regrets. If you ask Rachael now what she is most grateful for in life, she would tell you that she is most grateful for her mother and her family. But she would also tell you that she is grateful that she has been detained while her case has been pending. Her detention has allowed her to get out of the life she was living, and to get the distance from it to clearly see the havoc it was

wrecking on her life. She is finally ready to nurture the good side.

During her 23 months in custody, Rachael has taken full advantage of the opportunities provided to her through the Shawnee County Jail. Rachael has completed the following programs, *inter alia*:

- **Phase 1 – Technology for Employment**: Completed January 30, 2025.
- **Phase 2 – Online Personal Branding**: Completed February 27, 2025.
- **Phase 4 – Advanced Excel**: Completed March 13, 2025.
- **Phase 7 – Business Communications**: Completed April 3, 2025.
- **Phase 13 – Professional Interviews**: Completed April 10, 2025.
- **Phase 12 – Personal and Professional Development Skills**: Completed April 24, 2025.
- **Phase 6 – Advanced Digital Storytelling**: Completed May 22, 2025.
- **Phase 3 – Professional Writing**: Completed June 11, 2025.
- **Phase 8 – Advanced Google Sheets & PDFs**: Completed August 13, 2025.
- **Phase 10 – Coding: Python Programming**: Completed October 28, 2025.

(*See attached*, Certificates, Exhibit 1)

Rachael's commitment to rehabilitation is not merely academic; it is reflected in her daily conduct. Jodi Whitt, the ITC Resource Liaison, observed that Rachael's participation in jail programming "goes beyond mere attendance" as she actively "applies the material and often encourages her peers to do the same." (*See attached*, Letter of Support, Exhibit 2, p. 1). This demonstrates that the "good side" Rachael is cultivating is already bearing fruit in the way she interacts with her community.

Rachael's traumatic past and her ongoing perseverance do not excuse her behavior. She made the decisions that led her to this point. But those decisions represent just one broken gear in the old clock that is Rachael Matoian. But to be able to identify the cause of the break, and to fix it, to restore it to what it once was, you cannot just focus on that one broken gear. Because that gear affects and is

affected by every other part of the clock. You must look to the clock as a whole— identify what you can and use the witness marks to fill in the blanks. And determine where that clock fits in the world at large. It is abundantly clear to those around Rachael that she is looking toward the future, and that she "has the potential to be a contributing member of society and is working diligently toward that goal." (Exhibit 2, p. 1).

Rachael acknowledges that her offense is not one to be taken lightly. But neither is a sentence of 23 months. Rachael has accepted responsibility for her actions and has taken it upon herself to make the necessary adjustments to ensure the same mistakes cannot happen again. A sentence of 23 months presents adequate punishment so that Rachael will feel the impact of her conviction and sentence.

**The statutory sentencing factors weigh in favor of a time-served sentence of 23 months.**

A sentence of time served is sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing when viewed through the following factors:

### The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Rachael's history is defined by a significant lack of prior violent or sophisticated criminal history. Her transition from a productive worker in property maintenance and metal fabrication earning a lawful wage to a participant in this scheme was fueled by a relapse into methamphetamine use and her subsequent meeting of Mr. Cushing. The circumstances of the offense are inseparable from the abuse she suffered; Rachael was

9

essentially a captive of the conspiracy, kept in place by fear, digital isolation, and controlled substance use. However, Rachael does not hide behind this trauma; she admits that when she was high, she "wanted a challenge," and she takes full ownership of the fact that she allowed her addiction to lead her into Mr. Cushing's orbit.

While Rachael's past is marked by the "witness marks" of addiction and abuse, the person standing before the Court now has undergone profound change. Ms. Whitt, who has worked closely with her at the Shawnee County Jail, can "attest to the growth and sincere effort she has shown toward becoming a better version of herself." (Exhibit 2, p. 1). This is not a mere statement of intent change, but a professional observation about a woman who has systematically repaired the "gears" of her life while in custody.

### The Need for the Sentence Imposed

*Reflect the Seriousness of the Offense and Promote Respect for the Law*: Rachael has remained in custody since March 2, 2024. This period of nearly two years of incarceration—separated from her family and support systems—has served as a powerful deterrent and a clear reflection of the seriousness of the crime. It has also provided Rachael with the clarity to see the havoc her previous life was wreaking.

*Afford Adequate Deterrence*: The trauma of the abuse and the subsequent federal prosecution have provided significant specific deterrence. Rachael has stated she "aborted" her mission even before her arrest and now deeply understands the repercussions of her actions, indicating that further incarceration would serve no additional deterrent purpose.

*Protect the Public*: Rachael poses a low risk to the public. Her behavior while incarcerated—serving as a lead kitchen worker for 60 inmates and mentoring peers—demonstrates that she is a stabilizing, helpful force when removed from an abusive environment. Beyond serving as a lead kitchen worker, Rachael has actively fostered a peaceful environment within the jail. According to Ms. Whitt, Rachael "consistently conducts herself in a way that promotes a constructive environment among the other women in the facility," to the point that her "peers often look to her for guidance and encouragement." (Exhibit 2, p. 1). This high level of pro-social behavior confirms that Rachael is not a threat to the public, but rather a potential asset to her community.

### The Need to Avoid Unwarranted Sentence Disparities

The "lion's share" of the $841,261 loss was funneled to Mr. Cushing, who managed multiple groups of participants and possessed the technical skills to orchestrate the scheme. Racheal was a "runner" or watcher of runners who followed instructions on when and how much to withdraw. Cushing, on the other hand, was the one buying personal information on the Dark Web, printing the IDs, and making all the decisions. A sentence of time served for Rachael acknowledges her significantly lesser culpability as a victim of coercion and an "employee" of the fraud rather than its architect. Sentencing Rachael to further time could create a disparity by failing to account for the unique circumstances that dictated her involvement.

*The Need to Provide Needed Educational or Vocational Training*

Rachael has already proactively sought needed training while in custody. She has successfully completed ten phases of the University of Kansas digital education program. These 2025 certifications demonstrate that she is already equipped to be a functioning part of society.

Rachael has not just "stayed busy" during her 23 months of detention by completing programs; she has proactively rebuilt her professional identity through rigorous technical training. By successfully completing ten phases of the University of Kansas digital education program, Rachael has mastered high-level skills that transition her from manual labor to the modern digital economy. Her certifications are not for basic computer literacy, but for complex professional competencies:

- **Advanced Data Analytics**: Rachael mastered Advanced Excel and Advanced Google Sheets, tools essential for logistics, accounting, and data management.

- **Logical Reasoning and Syntax**: She successfully completed Coding: Python Programming, a curriculum that requires high-level problem-solving and logical syntax—skills that stand in direct opposition to the impulsive decision-making of her past.

- **Professional Communication**: Through courses in Business Communications and Professional Writing, Rachael has developed the ability to interact with the community at a corporate level.

These 2025 certifications are more than "witness marks" of attendance; they are proof of a recalibrated mind. They demonstrate that Rachael is already equipped with a high-skill toolkit that makes her immediately employable, providing the stability necessary to ensure she never again falls victim to what led her here.

12

## CONCLUSION

Rachael's life has been peppered with trauma. That trauma, her own poor decisions, and the systematic manipulation of an abusive partner led her to be before this Court. However, she has spent her period of incarceration reflecting on her life and is committed to a new path of redemption. Rachael knows that criminal conduct must be punished, but she also knows that the punishment must fit not only the crime, but the person as well. A sentence of time served best reflects the sentencing factors in 18 U.S.C. § 3553(a) and the Guidelines. Such a sentence appropriately considers adequate punishment for the crimes she committed, while remembering the architecture of control that led to them and reflecting on the extraordinary growth and positive steps she has already taken toward becoming a contributing member of society.

If the Court looks at the "witness marks" left by the past 23 months, it will see a clock that has been meticulously cleaned and recalibrated. Rachael has not only repaired the gears broken by others but has taken full responsibility for the parts she broke herself. The jail's Resource Liaison confirms this, noting that Rachael has "demonstrated a genuine commitment to positive change." (Exhibit 2, p. 1). She is no longer the broken mechanism that arrived in spring 2024; she is a woman who has found her rhythm and is ready to rejoin the world.

Respectfully Submitted,

SANDAGE LAW LLC

/s/ Sarah G. Hess
Sarah G. Hess, KS #26262
1600 Genessee Street, Suite 662
Kansas City, MO 64102
phone:816.753.0800
fax: 816.735.4602
sarah@sandagelaw.com
ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

On February 19, 2026, I served this document by depositing an electronic copy of it in the Court's electronic filing system, which shall distribute notice to all attorneys of record.

/s/ Sarah G. Hess
Sarah G. Hess

14